Benjamin N. Gluck - State Bar No. 203997
   bgluck@birdmarella.com
Christopher J. Lee - State Bar No. 322140
   clee@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Attorneys for Sang Bum Noh, aka "Ed Noh",

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>   vs.<br><br>SANG BUM NOH aka "Ed Noh",<br><br>        Defendant. | CASE NO. 2:20-cr-00370-VAP-2<br><br>**SANG BUM "ED" NOH'S SENTENCING MEMORANDUM**<br><br>Date:    December 6, 2021<br>Time:   9:00 a.m.<br>Crtrm.:  8A<br><br>Assigned to Hon. Virginia A. Phillips<br>Dept. 8A |

3763035.1

# **TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS ................................................................. 2

TABLE OF AUTHORITIES .......................................................... 4

INDEX OF EXHIBITS................................................................... 6

I. INTRODUCTION ..................................................................... 7

II. SUMMARY OF OFFENSE CONDUCT .................................. 8

III. HISTORY AND CHARACTERISTICS OF MR. NOH................................. 9

    A.    Mr. Noh's Upbringing in Post-War South Korea............................. 9

    B.    Mr. Noh's Young Adulthood and Immigration to the United States ........... 13

    C.    Ambiance and its Culture ..................................................... 14

    D.    Mr. Noh's Support of Charitable Causes ..................................... 20

    E.    Effect of Mr. Noh's Potential Incarceration on His Wife and Children. ...... 23

    F.    Report of Dr. Richard Romanoff.............................................. 25

    G.    Mr. Noh's Advanced Age and Poor Health .................................. 26

IV. NATURE AND CIRCUMSTANCES OF THE OFFENSE ....................................... 27

    A.    The Unreported Cash........................................................... 27

    B.    The Inaccurate Customs Valuations........................................... 28

    C.    The Plea Agreement ........................................................... 29

V. THE APPROPRIATE SENTENCE ........................................... 31

    A.    Impact of the Sentencing Reform Act......................................... 32

    B.    The Presentence Report and Recommendation................................ 33

    C.    A Non-Custodial Sentence Is Appropriate in Light of the § 3553 Factors ........... 35

        1.    The nature and the circumstances of the offense and the history and characteristics of the defendant - § 3553(a)(1)........................... 35

        2.    The need for the sentence to reflect the seriousness of the offense, to ........................................................ 36

        afford adequate deterrence, to protect the public from further crimes from the defendant, and to provide the defendant with needed

medical care - § 3553(a)(2) .................................................. 36

3.    The kinds of sentences available, the guidelines range, any pertinent policy statements. unwarranted sentencing disparities, and the need to provide restitution - § 3553(a)(3)-(7)....................... 38

VI. CONCLUSION ........................................................................ 38

1

# **TABLE OF AUTHORITIES**

2

**Page(s)**

3

**Federal Cases**

4

5

*United States v. Ameline,*
   400 F.3d 646 (9th Cir. 2005.)..................................................................... 32

6

7

*United States v. Bolds,*
   511 F.3d 568 (6th Cir. 2007)............................................................... 32, 38

8

9

10

*United States v. Booker,*
   543 U.S. 220 (2005).................................................................................. 32

*Gall v. United States,*
   538 U.S. 38 (2007) ............................................................... 7, 32, 38

11

12

*United States v. Plouffe,*
   445 F.3d 1126 (9th Cir. 2006).................................................................... 32

13

14

*United States v. Robinson,*
   -- F. Supp. 3d --, N.D. Cal........................................................................ 37

15

16

*United States v. Tadio,*
   663 F.3d 1042 (9th Cir. 2011)..................................................................... 32

17

*Torres v. Milusnic,*
   472 F.Supp.3d 713, 728 (C.D. Cal. 2020) ................................................. 37

18

19

*United States v. Trujillo-Terrazas,*
   405 F.3d 814 (10th Cir. 2005.)................................................................... 33

20

**Federal Statutes**

21

18 U.S.C. 1956(a)(2)(A)............................................................................ 30

22

18 U.S.C. § 371.................................................................................... 7, 30

23

18 U.S.C. § 542....................................................................................... 30

24

18 U.S.C. § 545....................................................................................... 30

25

26

18 U.S.C. § 3553................................................................................*passim*

27

26 U.S.C. § 7206...................................................................................... 30

28

31 U.S.C. §§ 5331, 5342........................................................................... 30

Fed. R. Crim. Proc. 11 ............................................................................... 30

U.S.S.G. § 2S1.3 .......................................................................................... 33

U.S.S.G. § 5B ............................................................................................... 38

**INDEX OF EXHIBITS**

| No. | Name | Notes |
|-----|------|-------|
| 1 | Letter from Compliance Monitor | |
| 2 | Report of Dr. Richard Romanoff | |
| 3 | Letter from Geumhee Noh | Younger sister |
| 4 | Letter from Junghee Noh | Younger sister |
| 5 | Letter from Myung Gon Moon | Childhood friend |
| 6 | Letter from Chil-gee Lee | Childhood friend |
| 7 | Letter from Jino Yoon | Childhood friend |
| 8 | Letter from Hai Won Park | Former Army superior officer |
| 9 | Letter from Annie Noh | Wife |
| 10 | Letter from Steve Noh | Son |
| 11 | Letter from Jose Ortiz | Ambiance employee |
| 12 | Letter from Richard Kim | Ambiance employee |
| 13 | Letter from Phillip Lee | Ambiance employee |
| 14 | Letter from Jose Luis Olivares | Ambiance employee |
| 15 | Letter from Irene Pak | Daughter of Ambiance employee |
| 16 | Letter from Mohammed Anisuzzaman | Supplier |
| 17 | Letter from Seungtae Hwang | Supplier |
| 18 | Letter from Joong Moon Choi | Supplier |
| 19 | Letter from Myung Ja Chong | Customer |
| 20 | Letter from Marty Stein & Joe Chehebar | Customer (Executives of Rainbow Shops) |
| 21 | Letter from Do Won Chang | Customer (Founder of Forever 21) |
| 22 | Letter from Jay Han | Ambiance Employee |
| 23 | Letter from Chang Seob Lee | Secretary General, Sogang University Alumni Association |
| 24 | Letter from Sohee Shin | LITE scholarship beneficiary |
| 25 | Letter from Sunghye Han | LITE scholarship beneficiary |
| 26 | Letter from Eulah Lee | LITE scholarship beneficiary |
| 27 | Letter from Youngho Ha | LITE scholarship beneficiary |
| 28 | Letter from Alex Kim | Missionary priest |
| 29 | Letter from Daniel Park | President, Korean American Chamber of Commerce in Los Angeles |
| 30 | Letter from Myong S. Tag | Church member |
| 31 | Letter from Jaemyung Choi | Church member |
| 32 | Letter from Jackie Noh | Daughter |
| 33 | Letter from Primary Physician | |
| 34 | Letter from Cardiologist | |

**I.**

**INTRODUCTION**

It has been uniform and constant in the federal judicial tradition for the

sentencing judge to consider every convicted person as an *individual* and

every case as a unique study in the human failings that sometimes mitigate,

sometimes magnify, the crime and the punishment to ensue.

*Gall v. United States*, 538 U.S. 38, 52 (2007) (citing *Koon v. United States*, 518 U.S. 81,

98 (1996)) (emphasis supplied.)

Defendant Sang Bum "Ed" Noh is sixty-seven years old and a successful

businessman.  He comes before the Court for sentencing, having pled guilty to conspiracy

in violation of 18 U.S.C. § 371 and subscribing to a false tax return in connection with the

operation of Ambiance U.S.A., Inc., a business he founded shortly after arriving to the

United States.  Ambiance is a successful business that contracts for the manufacture of

clothing, which it then sells to retailers.  It employs hundreds of people and as discussed

below, Mr. Noh and Ambiance have treated their employees, their customers, and their

vendors with unusual loyalty, dignity, and generosity.  Mr. Noh has also regularly – and

quietly – supported many substantial charitable endeavors.

The purpose of this sentencing memorandum is to explain – not excuse – Mr. Noh's

conduct.  It addresses the compulsions that led a successful businessperson who regularly

gives away millions of dollars to nevertheless "hoard" millions of dollars ███████

███████████████.  It describes the fears and anxieties that gripped Mr. Noh,

despite his evident success.  And it describes how those fears and anxieties during a time

of industry crisis led to his bad decision to withhold invoices from U.S. Customs and

ultimately led him to this Court for sentencing.

Mr. Noh acknowledges the seriousness of his offenses.  They involved millions of

dollars in unpaid taxes and duties and Mr. Noh does not seek to minimize that.  But this

sentencing memorandum also offers the Court the "unique study in human failings," *Gall*,

538 U.S. at 52, that explains why Mr. Noh is here today.

**II.**

**SUMMARY OF OFFENSE CONDUCT**

Mr. Noh founded Ambiance U.S.A, Inc., in 1999.  The company contracts with manufacturers in various countries to manufacture clothing, which it then imports to the United States as well as Canada.  Ambiance sells to large retail chains – such as Forever 21, Ross Dress For Less, and Rainbow – in lots of hundreds of thousands of pieces. Ambiance also sells to smaller "mom and pop" retailers in much smaller lots or even single pieces.  The latter sales are a small part of Ambiance's overall business, and they are handled through a small showroom in the Los Angeles Fashion District.  Mr. Noh was the key manager and day-to-day operator of Ambiance.

The conduct at issue here occurred between 2010 and 2014.  Specifically, during this time Ambiance did not report to its accountants all the cash it received from the showroom.  ████████████████████████████████████████████████████ ███.  Also during this time, Ambiance did not report to the customs service the full value of all of the products it imported, though it reported some, and Ambiance did not file currency transaction reports for all cash transactions over $10,000, though it did file some. The failure to report cash resulted in Mr. Noh underreporting his income for tax purposes and the failure to report the full value of Ambiance's imports resulted in underpayment of duties.

In about 2012, years before this investigation began, Mr. Noh, on his own volition, caused Ambiance to begin reporting on its books and paying tax on all of the cash it received.  The other conduct, namely the unreported customs value and failure to file currency transaction reports, continued until late 2014.  For the past seven years, however, *i.e.*, since late 2014, Ambiance has been operating in full compliance with all of its legal obligations.  It has undergone audits both before and after its settlement with the government and it is currently operating under a monitorship.  A letter from the monitor is included as **Exhibit 1** in which the monitor explains that Ambiance is in full compliance and Ambiance has in fact submitted to monitorship beyond even that ordered by the terms

of its sentence.

## III.

## HISTORY AND CHARACTERISTICS OF MR. NOH

While Mr. Noh takes full responsibility for his conduct, he asks that the Court consider for purposes of his sentencing his "unique study in human failings" arising from his life experience.  Born immediately after the Korean War and growing up in the devastated and poverty-stricken South Korea of the 1950s and 60s, Mr. Noh experienced an existential struggle by his parents for the survival and stability of their family.  The difficulties of Mr. Noh's childhood culminated in the trauma of his father's business failure and resulting incarceration in debtors' prison, followed by his family's further financial collapse and his father's resulting mental health issues.  Watching his father deteriorate physically and mentally due to guilt at letting his family down, Mr. Noh acquired a profound sense of obligation and responsibility for the well-being of those who depend on him, coupled with an overwhelming, even irrational, fear of failing them as his father had.  These emotions have driven every aspect of who Mr. Noh is today.  Indeed, every action Mr. Noh took was influenced, for better or worse, by his obsessive fear of failure, especially failing his family, employees, suppliers, and customers, whom he sees as relying on him.

### A.    Mr. Noh's Upbringing in Post-War South Korea

The geopolitical unrest during the first half of the Twentieth Century destroyed the foundations of Korean society.  Imperial Japan annexed the country in 1910 and subjected it to thirty-five years of brutal exploitation and colonial rule.  At the end of World War II, the country was split into "occupation zones" administered by the U.S. and the Soviet Union.  In 1950, the Korean War broke out between the U.S.-backed South and the Soviet-backed North, a destructive conflict with the largest proportional civilian death toll of any war in the modern era.  Millions of Koreans were killed, millions more were internally displaced or fled the country, and virtually all of Korea's major cities were completely

destroyed.[1]  Those who survived faced a harsh struggle for survival in a devastated country.

Mr. Noh was born about six months after the 1953 Armistice that suspended active conflict, though fighting sporadically continued despite the agreement.  By then, the occupation and the war had already left indelible marks on his family.  Mr. Noh's maternal grandfather died under Japanese rule, and Mr. Noh's mother spent most of her teenage years caring for her siblings in his absence.  (Exh. 2 (Report of Dr. Richard Romanoff) at 5.)  Mr. Noh's father fled the north to escape the communist regime and struggled to build a new life in the South.  (*Id.* at 5-6.)  Despite his life-long efforts, he never regained any real level of economic stability.

Violence was still prevalent in many parts of the country in the early 1950s, leading Mr. Noh's family to flee further south and reside in refugee housing.  (Dkt. 61 ¶ 92.)  Mr. Noh remembers that in his childhood years "everyone was poor [and] things were demanding all the time."  (Exh. 2 at 6.)  Mr. Noh recalls his parents' constant sacrifices simply to provide food for their children.  For example, the family could not afford to buy meat except twice a year, for New Year and Chuseok.[2]  (Dkt. 61 ¶ 92.)

Mr. Noh's father had been a teacher but was forced to give that up.  To make ends meet, he tried his hand in business, with financial assistance from relatives.  (Dkt. 61 ¶ 93.)  For a while this supported the family but when Mr. Noh was about ten years old, the business went bankrupt due to unpaid debts and Mr. Noh's father was sent to debtors' prison. (Dkt. 61 ¶ 92; Exh. 2 at 7.)[3]

---

[1]    *See generally* Encyclopedia Britannica, *Korean War*, *available at* https://www.britannica.com/event/Korean-War

[2]    Chuseok is a major Korean mid-autumn harvest festival, equivalent to Thanksgiving in the United States.  *See* https://en.wikipedia.org/wiki/Chuseok

[3]    South Korea at the time was ruled by a repressive military dictatorship which routinely imprisoned its citizens over minor offenses.  Mr. Noh's father was sent to prison when a check he wrote was returned for insufficient funds.

1    After Mr. Noh's father's business failure and imprisonment, the family lost their

2    house and relocated to a small two-bedroom apartment with their five children.  (Dkt. 61 ¶

3    93.)  Mr. Noh's father "never recovered" emotionally from the trauma of letting down the

4    people who relied on him for support and he suffered from depression for the rest of his

5    life, eventually passing away in 1983.  (Exh. 2 at 7-8.)  From the time he was released

6    from debtors' prison, Mr. Noh's father was never really able to support the family again.

7    Mr. Noh's mother suffered from severe – though treatable – health issues her entire

8    adult life.  While Mr. Noh was growing up, his mother was often bedridden for days due to

9    high blood pressure because the family could not afford to take her to the doctor.  (Dkt. 61

10   ¶ 91.)  She suffered several strokes, and eventually passed away from a stroke in 1995.

11   (*Id.* at 7.)

12   Having absorbed the trauma of trying to survive amidst complete devastation and

13   the further trauma of watching his family slide into greater poverty due to his father's

14   business failure, Mr. Noh developed a powerful sense of responsibility to provide for those

15   who rely on him – coupled with an overwhelming fear and anxiety of letting those people

16   down.  Dr. Richard Romanoff, who conducted a psychological examination of Mr. Noh,

17   opines that Mr. Noh "absorbed a deep fear of failure and an equally deep determination to

18   make sure his father's weakness would not be repeated in his life story, and that his family

19   would never need to experience the kind of anxiety and insecurity that characterized those

20   childhood years."  (Exh. 2 at 3).

21   This role as provider for those around him emerged even when Mr. Noh was a

22   child.  Mr. Noh became a surrogate caretaker for his family, filling the void left by his

23   father.  Mr. Noh's younger sister, Geumhee Noh, gives an example:

24          Though my family was so poor at that time, Ed shared what he had with

25          others.  When he was 12 years old, as a 6th grade student, he was preparing

26          for a big examination to go to a good middle school.  Back then, 6th grade

27          student studied hard until midnight to pass the examination.  Unbelievable,

28          but it was true.  My mother used to give one fried egg every morning only to

1      Ed, as there was not enough food for five kids.  One morning when he was

2      having breakfast, I looked at the egg and felt my mouth watering.  As he

3      noticed, he gave it to me without hesitation.  Probably it was not easy for a

4      12-year-old boy to give it to a 6-year-old sister, but it was just his nature.

5 (Exh. 3 (Geumhee Noh Letter).)

6        Mr. Noh's other younger sister, Junghee Noh, writes about Mr. Noh's commitment

7 to hard work, responsibility, and support for his family even as an adolescent:

8      When I was an elementary schoolgirl, Ed who was 13~14-year-old middle

9      school boy then, started a newspaper delivery.  As I was just a little kid, I

10      had no idea why he was doing his job.  One day, I ran into Ed carrying a

11      bundle of newspaper on the street.  Thin, small boy was holding a big

12      bundle. Then I could realize how hard he was working every day.  Seeing

13      me, he gave some money from his pocket.  That moment, I felt him as a big

14      grown-up though he was only three years older than me.  Young as he was,

15      he instinctively extended warm helping hand toward his sister in need.

16 (Exh. 4 (Junghee Noh Letter).)  This overriding desire to help and support others extended

17 past Mr. Noh's immediate family – even when his actions would put him at great

18 inconvenience or even personal danger.  Despite food not being plentiful for Mr. Noh's

19 own family, he would nevertheless take great joy in inviting hungry friends to his house –

20 sometimes as many as 10 at a time – to share his mother's home-cooked dumplings.  (Exh.

21 3.)  Myung Gon Moon, a middle school friend, recalls that when he injured his leg in PE

22 class, Mr. Noh volunteered to carry his schoolbag and walk him home – despite Mr.

23 Moon's residence being 40 minutes in the opposite direction.  (Exh. 5 (Moon Letter).)

24 Chil-gee Lee, another middle school friend, recounts an outing to a lake in 1970 when Mr.

25 Noh jumped into deep water to rescue a drowning friend.  (Exh. 6 (Chil-gee Lee Letter).)

26 Another friend, Jino Yoon, says he "owe[s] his life" to Mr. Noh.  During his youth, Mr.

27 Yoon got into a fight with a man who happened to have several companions nearby who

28 were ready to attack and seriously injure him.  Mr. Yoon says that Mr. Noh stood between

1   him and the angry "mob," and managed to spirit him to safety.  (Exh. 7 (Yoon Letter).)

2   These small acts of commitment and kindness were significant enough that the recipients

3   recall them now, decades later, and they illustrate the way Mr. Noh sees himself, namely

4   as someone who can be relied upon to help others in times of need.

5   **B.**    **Mr. Noh's Young Adulthood and Immigration to the United States**

6          Despite the family's financial troubles, Mr. Noh's parents insisted that their

7   children obtain an education.  Through a combination of hard work and their parents'

8   determination, Mr. Noh and all four of his siblings would go on to obtain a college degree

9   – a rarity for their generation.  (Dkt. 61 ¶ 92.)  Mr. Noh attended Sogang University, a

10   Jesuit four-year college in Seoul, where he met his wife, Annie Noh. (*Id.* ¶ 94.)  Mr. Noh's

11   college education was interrupted when after his sophomore year, he left for three years of

12   mandatory military service.  Mr. Noh was stationed at the DMZ, the heavily fortified

13   border between the two Koreas, and served first as a border guard and then later as an

14   administrative assistant to the commander.  (Exh. 2 at 9.)  The period as a border guard

15   was traumatic, with frequent gunfire and shooting deaths for troops in a very isolated area

16   with no power or water during the harsh Korean winter.  Mr. Noh describes being scared

17   and shocked by what he saw.  (*Id.*)

18          While some Korean men come to resent their military service as a waste of their

19   prime years, Mr. Noh built relationships in the military that lasted a lifetime.  After his

20   discharge, Mr. Noh would send food packages to his former comrades who were still

21   serving.  (*Id.*)  In another example of Mr. Noh's longstanding sense of obligation to his

22   military comrades, he surprised a former superior officer with a trip to the United States as

23   a token of his gratitude for a decades-old favor: in 1979, when Mr. Noh's wife was

24   pregnant with their eldest child, Hai Won Park loaned him a small amount of money to

25   help with hospital bills.  Mr. Noh repaid the loan shortly thereafter.  Nevertheless, thirty

26   years later, Mr. Park received a surprise call from Mr. Noh, inviting Mr. Park and his

27   family on an expenses-paid trip to the U.S.:

28          Ed, CEO of the U.S. clothing company invited my family to his house in LA.

1    He has provided us with a tour of the United States and gave us a great feast

2    and hospitality for about 10 days.  Right before I took the flight back to

3    Korea after the invitational tour, I asked him a question with curiosity and

4    gratitude.  "Why did you find me?"  Ed's answer was, "Because we still have

5    trust from more than 30 years ago."

6    (Exh. 8 (Hai Won Park Letter).)  After returning to school and graduating, Mr. Noh

7    worked briefly as an insurance underwriter, but grew to see the job as a dead end that

8    would never afford him sufficient financial freedom to provide for his new family.  (Exh. 2

9    at 9).  In 1985, spurred on by American co-workers impressed by Mr. Noh's performance,

10   he chose to emigrate to the U.S. in search of opportunity.  (*Id.*)

11   Life as a new immigrant in the U.S. was initially not what Mr. Noh had imagined.

12   Having left a white-collar office job in Korea, Mr. Noh had to transition to working as a

13   door-to-door salesperson for a fashion company.  (Exh. 2 at 9.)  Annie Noh recalls

14   accompanying Mr. Noh on his sales trips, where he would load up the trunk with huge

15   duffle bags full of samples but would always make time between stops to take her and their

16   children places, such as to the beach.  (Exh. 9 (Annie Noh Letter).)  While tackling this

17   new role in an unfamiliar industry was difficult, Mr. Noh's open demeanor and

18   commitment allowed him to develop a knack for sales.  His son, Steve Noh, recalls being

19   shocked by his father's transformation: "I did not know my father could speak English that

20   well, and certainly didn't know he could be so engaging with strangers.  I always wanted

21   to follow the things my father did anyway, but this stuck in my memory because I saw him

22   shift gears and become a different person[]."  (Exh. 10 (Steve Noh Letter).)

23   In 1988, three years after his arrival, Mr. Noh started his own business: a small

24   clothing stall in the San Fernando Valley swap meet. (Exh. 10.)  His persistence and work

25   ethic bore fruit and three years later, he had two retail stores, the profits from which

26   allowed the Nohs to finally purchase a home. (Exh. 2 at 10.)

27   **C.    Ambiance and its Culture**

28   In 1999, Mr. and Mrs. Noh started Ambiance U.S.A., a clothing wholesale business.

Mrs. Noh describes the compulsion that drove Mr. Noh to make the business succeed: "I remember Ed telling me at that time that he couldn't stop working, not because he was trying to make money, but because he was desperate to not let the business fail since he was responsible for the livelihoods of our family and our employees." (Exh. 9.)  As a result, Ambiance grew rapidly to become one of the largest fast-fashion wholesalers in the United States.

Despite this growth, Ambiance was still run like a family business, with an ethos borne in Mr. Noh's image.  For Mr. Noh, Ambiance was not just a means for his own financial success, but also the vehicle through which he satisfied his overriding drive to support those who rely on him.  As a result, he took on a protective, almost paternalistic role towards his employees that is highly unusual for the type of large business that Ambiance has become today.  Even now, with hundreds of employees, each and every employee is paid regular bonuses, and each receives a handwritten card for his or her birthday, as well as personalized gifts for Thanksgiving and Christmas.  Jose Ortiz, an Ambiance warehouse supervisor, has high praise for Mr. Noh's generosity:

> Ever since I worked here, he has been very generous to me and all the other employees. For some time he gave us a bonus every 3 months to thank us for our hard work. The extra bonuses helped me out a lot to support my family, especially since my kids went to private schools therefore they were the beneficiaries. Also on Thanksgiving Day every year till this day, he provides us with a good lunch for all the employees. When I needed help financially, the company lent me money and allowed me to pay it back little by little. Because of this, my children were able to continue studying at college and when they come by the company, Mr. Noh welcomes them like family.

(Exh. 11 (Ortiz Letter).)  Moreover, apart from giving bonuses, Mr. Noh has treated his employees as members of a "family" by sharing in and supporting them in their good times and bad.  When Richard Kim, an employee in the accounting office, lost his father, the entire Noh family attended the funeral.  (Exh. 12 (Richard Kim Letter).)  Phillip Lee, a

senior employee, describes Mr. Noh's managerial style:

> He is the one who taught me the principle of caring where caring for others
> doesn't mean a loss on us but that caring for others leads to caring for us
> instead.  In that respect, the consideration that Ed has given for all the
> employees over the past years is so much that I cannot even list them all . . .
> When I struggled without hope because of these many different kinds of
> problems, Ed encouraged me, at my toughest time, saying, "Phillip, now you
> have to get up and brush off and stand on your feet.  Anyone who lives a life
> does have problem that you are having now.  Hey Phillip, I'm not telling you
> as your boss but as a human being, we all are facing difficulties and so am I.
> I'm really having a hard time too but we need to be strong." and his words
> really touched my heart to rethink and get up and rise from the ashes.  He did
> not just comfort me and my family, but he helped us financially, and he was
> with us with sincere caring mind.

(Exh. 13 (Phillip Lee Letter).)  In particular, Mr. Noh has always taken a close interest in
the welfare of his employees' children and gone to great personal lengths to support their
education.  Jose Luis Olivares, who works in Ambiance's warehouse, describes how he
received a personal loan from Mr. Noh to pay for his youngest daughter's college tuition.
(Exh. 14 (Jose Luis Olivares Letter).)  Irene Pak, the daughter of a longtime employee,
recounts her close personal relationship with the Nohs, who took an interest in her
academic success:

> They constantly reminded us of the happiness that our success brought them,
> and their sincerity was proven by their actions.  From my junior high
> graduation and my annual awards ceremonies throughout high school to even
> just learning about my grades after a successful semester, Mr. and Mrs. Noh
> never failed to congratulate me with gifts and heartwarming messages that I
> have kept with me to this day.  After hearing about my college acceptance,
> they were quick in sending my mother home from work that day with a card

1    that said, 'Congratulations on your achievements!  We're so proud of you,

2    and it's our pleasure to watch you trying so hard to achieve your goal.

3    Dream high!"  Then, soon afterwards, they gifted me with a Montblanc

4    fountain pen – a pen that has become very special to me and now sits on my

5    desk as a reminder of their love and a source of motivation every day.

6  (Exh. 15 (Pak Letter).)

7    Perhaps the best indication of Mr. Noh's uniquely close and caring relationship with

8  his employees is that before his plea agreement was filed with the Court, he gathered all

9  his employees to inform them of his guilty plea and apologize to each of them personally

10 for letting them down.  (Exh. 2 at 17.)  In that emotional and tearful companywide

11 meeting, employees expressed their support for Mr. Noh and, importantly, committed to

12 full compliance with the monitorship.  Mr. Noh is gratified that not one employee chose to

13 leave the company in the aftermath of the announcement, (*id.*,) and he knows that he now

14 bears responsibility not to let them down further.

15    Mr. Noh's sense of responsibility extends not only to his employees, but also to his

16 suppliers and customers – many of whom run small businesses or "mom and pop"

17 operations that remind Mr. Noh of his experience as a new immigrant in the 1980s.  Some

18 successful entrepreneurs view the ecosystem of smaller businesses around them as easy

19 prey to be exploited for profit.  For Mr. Noh, it is precisely the opposite: treating his

20 business partners fairly and ensuring that they can thrive is as much of an imperative as

21 taking care of his own employees.

22    Many of Mr. Noh's suppliers, for example, recall examples of him supporting them

23 unconditionally through difficult times even though he had no obligation to do so.

24 Mohammed Anisuzzaman, a supplier from Bangladesh who has been selling to Mr. Noh

25 for over a decade, says that every year Mr. Noh grants "extensions after extensions" for

26 deliveries, personally absorbing any losses resulting from the product's late arrival.  (Exh.

27 16 (Anisuzzaman Letter).)  When Seungtae Hwang's small factory began supplying denim

28 to Mr. Noh in 2018, quality and shipment issues arose with his product.  He was amazed to

find that instead of cutting ties as other big companies would have, Mr. Noh was
understanding and even offered him advice on how to improve production.  (Exh. 17
(Hwang Letter).)  Joong Moon Choi, who has been supplying Mr. Noh since 2014, says
that Mr. Noh's approach stands out in an otherwise cutthroat industry:

> From my experience in this highly competitive industry, I have witnessed
> many unfaithful and deceptive people.  For example, I have had business
> partners who don't take responsibility for finished products that they ordered
> or make inadequate claims after taking the finished products.  But Mr. Noh
> has never done that. He has always been honest and follows through with his
> commitments.  Even though we are one of his many overseas suppliers, he
> has always carefully worked with us for the entire process, from beginning to
> end, as if it was his own business.  In 2014, I was almost bankrupt due to
> difficulties as a foreigner running a large factory in China.  At that time, Mr.
> Noh supported me unconditionally.  For that reason, I can stay on my feet
> today and support over 500 of my own employees.

(Exh. 18 (Joong Moon Choi Letter).)  Additional letters from vendors are filed with this
memorandum.

Mr. Noh's customers – from small retail shops to nationwide chains – also attest to
his honesty, integrity, and generosity.  Myung Ja Chong, who operates a small clothing
store in Fontana, CA, says that Mr. Noh is always willing to extend her credit during hard
times and allows her to pay when she can.  (Exh. 19 (Chong Letter).)  And though it is a
relatively small gesture, multiple customers note that Ambiance is well known in the
fashion district for being the only store to provide all customers visiting their showroom
with free food, including "sandwich, kimbap (Korean sushi), and hot gourmet coffee[.]"
(*Id.*).  Marty Stein and Joe Chehebar, executives of Rainbow, one of Ambiance's largest
customers, remark that Mr. Noh is always willing to go above and beyond his "legal"
requirements for the sake of their relationship:

> [W]e have come to know Mr. Noh and always have found him to be

1      trustworthy and honorable in our business relationship . . . Time and again,

2      Ed has demonstrated a commitment to serving our needs, even at the expense

3      of his company's profits.  On several occasions, when we agreed to purchase

4      apparel at a specific price but we then needed to price the merchandise lower

5      to be competitive with other retailers, or to push sales of the merchandise

6      faster, Ed agreed to accept less than the contractually agreed-upon purchase

7      price in order to accommodate us, reducing or eliminating his own profit on

8      those goods.  He could have held us to the original price, yet he willingly

9      took less to allow us to compete.

10  (Exh. 20 (Stein & Chehebar Letter).)  Do Won Chang, founder of Forever 21, who first

11  met Mr. Noh in the Los Angeles Fashion District as a fellow Korean immigrant in the

12  1980s, recounts a story that exemplifies Mr. Noh's integrity in business:

13      A few years back, I received a phone call from Ed. By chance, he was

14      walking by one of my stores and noticed that the products he sold me were

15      not of the quality he expected.  Understanding that customers always come

16      first, he promptly called me and told me that the products were not up to par

17      and didn't want us to sell any products that could hurt our customer

18      experience.  He went as far as to call to apologize and said he would take the

19      products back at his expense, because this is not what good business vendors

20      do. His integrity and his upmost focus on helping companies grow together,

21      really left a lasting impression with me.

22  (Exh. 21 (Chang Letter).)  Many additional similar letters from other customers are filed

23  with this memorandum.

24      The extent of Mr. Noh' near-compulsive refusal to let down his employees,

25  customers, and business partners became even more evident during the COVID-19

26  pandemic, when his entire company ground to a halt for two months due to stay-at-home

27  orders.  Despite a complete cessation of operations, and an industry-wide wave of layoffs,

28  Mr. Noh refused to lay off a single employee, or even reduce pay, until the company

reopened.  (Exh. 9; Exh. 13.)  Mr. Noh believed that his showing support to his employees through difficult times would one day be "returned by their dedication and loyalty."  (Exh. 9.)  When Jay Han, an Ambiance salesperson, told Mr. Noh that his son's school was closed and he had no place for him to go during the day, Mr. Noh set aside a computer station so Mr. Han's son could attend school from Ambiance's office.  (Exh. 22 (Han Letter).)  Perhaps even more remarkably, Mr. Noh did not cancel a single purchase order previously issued to his suppliers, despite incurring mounting losses to the company due to his retail customers cancelling orders.  (Exh. 13.)  He felt that doing so would let down suppliers who depended on him and he decided instead to incur the loss himself.

**D.     Mr. Noh's Support of Charitable Causes**

As explained above, Mr. Noh's upbringing in a harsh, impoverished society instilled in him a drive to not let down the people who depend on him.  To his credit, as his business success grew, so did the circle of those he supports.  For many years, Mr. Noh has supported needy people far beyond his family and business relationships.  He has built a major scholarship fund, he supports religious missions in Africa, and he supports orphanages in Southeast Asia.  Mr. Noh makes a conscious effort to keep these contributions quiet, often discouraging the beneficiaries from contacting any media to publicize his gifts.  (Exh. 2 at 13.)

Mr. Noh's most significant charitable initiative has been the LITE scholarship fund established at his alma mater, Sogang University.  Mr. Noh created LITE in 2010 to provide tuition support for low-income students.  (Exh. 23 (Chang Seob Lee Letter).)  The scholarship is funded by personal contributions from the Nohs, who to date have helped over 350 students at Sogang pay their tuition and complete their education.  (*Id.*)  The only conditions on these grants are that a) beneficiaries must participate in volunteer work and b) beneficiaries must commit to making their own financial contributions to LITE after graduation - no matter how small.  (*Id.*)

Over the years, LITE has changed the lives of hundreds of young people who could not attend college or were at risk of dropping out due to severe financial distress.  Sohee

Shin, whose family was hundreds of thousands of dollars in debt due to her father's cancer treatment, says that she was about to give up on her education before the LITE scholarship brought her back from the brink:

> I began to question whether attending college was really the right path for me, and if I even had the right to spend money on tuition when my family was struggling . . .  A few days after I made the decision to quit, I got the call that I had been selected for the LITE Scholarship.  And I don't even know how to write or express how much it meant to me.  I am mad at myself for not being a better writer to be able to fully express my gratitude.  But what I can say with confidence is that the value of the 3.6 million won you provided is so much more to me than the actual amount of money.  I only know your names and I don't even know what you two look like, but to me it felt like even though you were in a far-away country, you saw me and nodded your heads at me and said, "I know it's been hard for you." And when I received your compassion, it gave me so much more motivation and more strength to move forward than when I forced myself to keep going by convincing myself that I'm okay.

(Exh. 24 (Shin Letter).)  Similarly, Sunghye Han remembers the impossible task of working several jobs to pay for her mother's medical treatment and her sister's education before the scholarship allowed her to cut down her work schedule and stay in school. (Exh. 25 (Han Letter).)  Eulah Lee recalls that after learning that the scholarship would cover her tuition, her parents were able to use the money they had saved to buy new sneakers for her younger brother for the first time in his life.  (Exh. 26 (Eulah Lee Letter).) Youngho Ha, says that the example Mr. Noh set with the LITE scholarship has made him set a goal of establish his own scholarship foundation:

> The fact that he didn't have just a one-off courtesy meeting but made time to continuously reach out to keep up a relationship with the students made me reflect on myself.  I had already started working at that time so I

knew how hard it would have been for him to take time out of his busy work
schedule and pursue meetings with the scholarship students instead of taking
a personal vacation.  His continued attempts to reach out and connect with
the students made me feel the meaning that he places on the value of sharing
and showed me that he truly valued them.  Ever since I met Mr. Noh in 2012,
I have always been proud to say that my dream is to establish my own
scholarship foundation.  In the midst of studying in difficult circumstances,
the scholarship money provided to me by Mr. Noh not only helped me out
financially, it also taught me the value of sharing and contributing, and led
me to have the dream to have a positive effect on the world by practicing a
way of sharing from my painful experience of poverty.

(Exh. 27 (Ha Letter).)  These are just a few examples from the many more letters from
LITE beneficiaries filed along with this sentencing memorandum.

LITE is only one of Mr. Noh's numerous charitable contributions.  Mr. Noh has
paid for a library in Malawi used by hundreds of college students, (Exh. 28 (Alex Kim
Letter),) supports four orphanages in Myanmar, (Exh. 29 (Daniel Park Letter),) provides
housing and clothing to low-income communities in Peru, (Exh. 30 (Tag Letter),) and
contributed to the construction of a Korean Catholic Church in Orange County, (Exh. 31
(Jaemyung Choi Letter).)  Daniel Park, who has worked with Mr. Noh to support the
orphanages, stresses that Mr. Noh gives not because he is a thoughtless rich man who has
more money than he knows what to do with, but because he genuinely feels a
responsibility to the larger community, both in business and in his personal life:

Not all rich people are generous or care about others and I believe Ed helps
others not because of his wealth but because of true compassion and a warm
heart.  After 2017, the economy was gradually going down but Ed's
company was still growing.  Even while he was doing so well, Ed told me
that he was concerned about the wellbeing of other companies.  He
emphasized that everybody growing together is much better for the economy

1    than just his company and a few others being successful.  Ed is also a huge

2    Korean American community advocate and a leader, always providing a

3    helping hand to those in need, whether they are his customers or not.  I have

4    served alongside with him on countless events to support, strengthen, and

5    better our community through volunteer work, networking events, and

6    community service.

7  (Exh. 29.)  Additional similar letters are filed with this memo.

8       While Mr. Noh's charitable contributions may not excuse his conduct, his

9  willingness to quietly give away his time and money to support complete strangers – not

10  just in his native Korea or his adopted home in Southern California, but around the world –

11  is further evidence that his crimes were motivated by his own "unique human failings."

12  **E.**    **Effect of Mr. Noh's Potential Incarceration on His Wife and Children.**

13       Given Mr. Noh's fierce devotion to his family, it is not surprising that he has

14  developed a relationship with his wife, Annie Noh, that is atypically close even by the

15  standard of spouses.  Dr. Romanoff assesses that Ms. Noh has developed "a significant

16  dependency [on Mr. Noh] in order to maintain her currently fragile psychological

17  stability."  (Exh. 2 at 16).  Ms. Noh suffers from a chronic spinal condition, as well as

18  mental health issues including insomnia, panic attacks, and anxiety.  (*Id.*)  Jackie Noh,

19  their daughter, believes that Ms. Noh has "built her life around" Mr. Noh, and that her

20  psychological condition would deteriorate further as "there would be no one to tell her to

21  go to bed, and share positive times with her, she'd be alone."  (*Id.*)  In her own words, Ms.

22  Noh describes the effect losing her husband would have on her as follows:

23    If [my husband] has to leave us for incarceration, it is unthinkable how much

24    it would pain all of his immediate and extended family members.  In my

25    situation alone, I am dependent on Ed due to the care he provides for my

26    spinal disorder and without him I would have to move to a place where I

27    could get help because of the physical limitations in my daily life.  I honestly

28    don't know how I could live without him.

(Exh. 9.)  Mr. Noh also has an extremely close relationship with his two children, Steve and Jackie.  Despite his tireless work ethic, Mr. Noh was never an absentee father who only worried about financial support.  As his daughter describes, Mr. Noh always put his children first:

> Like all dads, his stories are 10-15% too long.  He asks me at least once a week if my household has enough to eat (a vestige of a childhood immediately following the Korean War).  When I was a child, he took me to as many home games of his beloved Dodgers as he could, during which we established rituals like guessing the game's attendance or trying to call in to KABC's post game radio show.  Even when we didn't have much money for a long time when I was growing up, he saved up diligently to take us to Disneyland, put up Christmas trees, take us on road trips, splash out as much as he could on birthdays, all to show us how lucky we were to be in this country and to show us what was possible with hard work.  Almost three years ago, he dropped everything and raced to the hospital waiting room the moment I told him I was in labor, knowing it would be hours but unwilling to wait a minute longer than necessary to meet and spoil his first grandchild.  Honest to goodness, he actually claps his hands with delight every single time he sees his grandson, still.  He had the patience to teach me how to drive twice (automatic and manual), he can't help but buy me unsolicited treats and snacks, and he delivered a speech that was equal parts sweet and serious - with no notes, less than 24 hours after suffering a small stroke - to bring down the house at my wedding.  I mean this with no exaggeration: everything I have, really and truly everything, is thanks to him and his innate sense of dedication and sacrifice.  My mom, by his side for nearly five decades, can say the same.  So can my brother.

(Exh. 32 (Jackie Noh Letter).)

Steve Noh, Mr. Noh's son, writes:

1  Even when I was a teenager and didn't want to talk to him or my mother, I

2  could always turn to him in dark moments, and I did.  He somehow knew

3  exactly what to say to either make it better or help me understand what I

4  need to do.  In one ear and out the other was a way of life for me, but my

5  father's word stuck when no one else's would.  Even today, he's always with

6  me right in my pocket . . .  He was different from other fathers with his time

7  too.  While most worked very hard, the time they had after was spent mostly

8  for themselves, doing such things as going out drinking, playing cards, etc.

9  Given the pressure, it's understandable people need to blow off steam.  My

10  father had many friends, but I remember much more meeting them as

11  families than him going out by himself.  And he certainly did not need to

12  take his sullen, teenage son golfing right after work when I'm sure all he

13  wanted to do was collapse into bed.

14  (Exh. 10.)

15  **F.    Report of Dr. Richard Romanoff**

16      Dr. Richard Romanoff, a forensic psychiatrist, has evaluated Mr. Noh and has

17  prepared a formal report that the defense is submitting to the Court along with this

18  Memorandum as **Exhibit 2**.  Dr. Romanoff has more than thirty-five years of experience

19  conducting forensic psychological evaluations and has completed more than 2,800

20  psychological evaluations in connection with state and federal court proceedings.  He has

21  been retained or appointed by defense attorneys, prosecutors, and judges, evaluating

22  individuals whose charges range from simple misdemeanors to death penalty cases.  For

23  purposes of his evaluation, Dr. Romanoff interviewed Mr. Noh on six separate occasions –

24  on October 16, 2019; October 21, 2019; October 29, 2019; December 2, 2019; October 11,

25  2021; and October 28, 2021.  In addition, Dr. Romanoff reviewed the Plea Agreement

26  (Dkt. 7,) the letter from Pretrial Services to the Court (Dkt. 60,) the Presentence Report

27  (Dkt. 61,) and various support letters.  Dr. Romanoff also conducted interviews with Mr.

28  Noh's wife Annie, his daughter Jackie, and Phillip Lee, an employee.

1    Dr. Romanoff's report contains a thorough history and assessment of Mr. Noh and

2  his conduct, going into great detail.  It is much more thorough than can be reproduced

3  here.  Based on his evaluation and expertise, Dr. Romanoff concludes that "Mr. Noh is an

4  overwhelmingly law-abiding individual, with no evidence of general antisocial tendencies"

5  who is nevertheless subject to a "co-existing collection of anxieties and insecurities" which

6  contributed to his conduct.  (Exh. 2 at 20-21.)  Dr. Romanoff also asks that the Court

7  consider the effect that extended incarceration of Mr. Noh could have on Ms. Noh,

8  including "significant physical and psychological deterioration" (*Id.*)

9  **G.    Mr. Noh's Advanced Age and Poor Health**

10    Mr. Noh is sixty-seven years old, and has a long history of chronic illness.  In 1983,

11  Mr. Noh suffered from tuberculosis, (Dkt. 61 ¶ 93,) which left him with permanent lung

12  scarring.  Also, Mr. Noh has a family history of strokes, and has suffered one stroke

13  himself, in 2017.  (Exh. 33 (Physician Letter).)  Combined with sustained high levels of

14  cholesterol and blood pressure, this puts him at increased risk of recurring stroke or heart

15  attack. (*Id.*)  Due to these issues, Mr. Noh's  blood pressure is monitored daily through a

16  remote system.  (*Id.*)  In September 2021, Mr. Noh was diagnosed with a chronic heart

17  condition after the system detected a sudden spike in his blood pressure.  (*Id.*)  Both Mr.

18  Noh's regular physician as well as his cardiologist assess that this condition puts him at

19  high risk of a heart failure, and will require close monitoring and maximum medication.

20  (*Id.*; Exh. 34 (Cardiologist Letter)).  In addition, Mr. Noh has experienced significant

21  hearing loss, and cannot hear clearly without use of hearing aids.

22    Due to a combination of his advanced age, the lung damage caused by his

23  tuberculosis, and his hypertension and heart condition, Mr. Noh is at high risk of severe

24  illness or death should he contract COVID-19.[4]

25

26  _____
    [4]   *See, e.g,.* Center for Disease Control, *People with Certain Medical Conditions*, updated

27  October 14, 2021, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-
    precautions/people-with-medical-conditions.html; U.S. National Library of Medicine,

28  National Institutes of Health, *COVID-19 – Tuberculosis interactions: When dark forces*

**IV.**

**NATURE AND CIRCUMSTANCES OF THE OFFENSE**

**A.    The Unreported Cash**

As noted above, the vast majority of Ambiance's business was, and is, with large customers where all transactions were done by wires and checks.  Cash was a small part of Ambiance's business.  Having said that, it is also true that many, many transactions in the apparel district near downtown Los Angeles have historically been done in cash and Ambiance's showroom was no different.  Indeed, the government issued a Geographic Targeting Order for the district precisely because of this.  These widespread practices are also what led to the 2014 "sweep" of the district that involved more than 1000 officers executing dozens of search warrants at myriad locations, one of which was Ambiance and that ultimately led to this prosecution.[5]

In any event, before 2014, customers at Ambiance's showroom often chose to pay with cash and while some did fill out Form 8300s, which Ambiance properly reported, most were reluctant, at best, to fill out any forms.  This meant that insisting on filling out the forms would cause many customers to decline the transaction.  Mr. Noh recognizes that he should have made sure that Ambiance declined these unreported cash transactions, especially since they were only a small part of his company's sales.  But spurred by his irrational anxiety and fear about Ambiance's failure as discussed above, Mr. Noh caused Ambiance to accept the cash and not report it.  Instead, he used it as a kind of "security blanket" against his anxieties by ██████████████████████████████████ ████████████████.  Over many years, he accumulated more than $30 million in this

_collide_, available at  https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7362784/ ("Large numbers of patients who have TB or have recovered from it are left with fibrotic scarred lungs, compromised lung function and the effects of COVID-19 can be particularly devastating in this patient population.")

[5]    _See_ September 10, 2014, USAO Press Release, available at https://www.justice.gov/usao-cdca/pr/large-scale-law-enforcement-effort-targets-downtown-los-angeles-businesses-linked-money

1  way.

2       It is worth noting the oddity of this conduct: while it is true that Mr. Noh has lived a

3  very comfortable lifestyle, he did not enjoy the accumulated cash by using it to buy yachts,

4  sports cars, or other perquisites of enormous wealth.  He did not invest it or ████████

5  ████████████████████.  Instead, ████████████████ as a security blanket

6  and physical antidote to his anxiety.  None of this is to say that he is not criminally liable

7  for his conduct.  But in terms of the "unique failings" involved here, Noh's conduct was

8  hardly typical.

9       Mr. Noh admits that in 2011, he underpaid his income tax by about $4.6 million.

10 But during 2012, two years before the searches warrants and long before he had any

11 inkling of government scrutiny, Mr. Noh established a new affiliated company called

12 Apparel Line, with the intent that this new company would "start fresh" and that

13 henceforth all cash received would be deposited into the bank and declared as income on

14 Ambiance's and Mr. Noh's tax returns.  This caused the underpayment for 2012 to be $2.2

15 million, less than half the prior year.  And there is no dispute that after 2012, Mr. Noh,

16 Ambiance, and Apparel Line reported all incoming cash on the books and paid all taxes on

17 it.[6]

18 **B.     The Inaccurate Customs Valuations**

19      As noted, Ambiance imports most of the goods it sells.  For many, many years,

20 Ambiance's typical transactions have involved two separate payments, one by bank letter

21 of credit and one by wire.[7]  For various business reasons, the letter of credit typically

22

23 _____

   [6]    As an aside, Ambiance's and Mr. Noh's effective tax rate have been over 50%, mainly

24 because neither the company nor Mr. Noh have engaged in any of the many *legal* tax

   management strategies available to them.  This is not to applaud them for paying tax, but it

25 is consistent with the characterization of Mr. Noh as someone whose first instinct is not

   greed for every available penny.  (Ambiance is a pass-through entity so all of its income is

26 reported on Mr. Noh's return.)

27 [7]    The letter of credit portion is paid immediately and the wire is paid later.  Also, letter of

28 credit payments involve higher transaction fees than wires and Ambiance has a limit on its

1  represented somewhere around two-thirds of the purchase price, while the wire represented

2  about one third, though these could and did vary.  Each of these payments was represented

3  by a separate invoice.  Together, the two invoices reflected the full value of the imported

4  product.

5      Beginning around 2010 and continuing into 2011, there was a worldwide spike in

6  the price of raw cotton.  Prices rose more than 300% and reached levels not seen in over

7  140 years.[8]  Because most of its products are cotton, these market pressures were an

8  existential threat to Ambiance, and Mr. Noh reacted badly to it.  As set out in the

9  Information, Ambiance began withholding the second, smaller wire invoices from the

10  Customs declarations, which lowered the reported value and therefore lowered the duty

11  owed.  The cotton price spike lasted for quite some time but even after it settled down,

12  Ambiance continued this practice until 2014.[9]  In all, Ambiance avoided paying about $17

13  million in duty.

14  **C.      The Plea Agreement**

15      Though this case is quite old, it is not because Mr. Noh resisted admitting his

16  misconduct.  Instead, he pled guilty before being indicted and agreed to significant

17  penalties.

18

19  ─────────────────────────

20  line of credit, which limited letter of credit availability.  The precise split between the two
payments is part of the negotiation of the transaction.

21  [8]   *See, e.g.*, *The Impact of Soaring Cotton Prices on Consumer Apparel Prices*, U.S.

22  Bureau of Labor Statistics, Aug. 2011, available at

23  https://www.bls.gov/opub/btn/archive/the-impact-of-soaring-cotton-prices-on-consumer-
apparel-prices.pdf

24  [9]   Ironically, because many of Ambiance's foreign vendors actually subcontracted out

25  their manufacturing, many of these purchases likely could have been legitimately subject

26  to the first-sale-doctrine that would have resulted in decreased duty by 15-35%.  But taking

27  advantage of this doctrine required special declarations upon entry, which Ambiance did
not make.  *See generally*, https://www.federalregister.gov/documents/2008/08/25/E8-
19640/first-sale-declaration-requirement.

28

1        Pursuant to the plea agreement, Mr. Noh pled guilty to one count of conspiracy in

2  violation of 18 U.S.C. § 371,[10] and one count of subscribing to a false tax return in

3  violation of 26 U.S.C. § 7206(1).  The plea agreement stipulates to a Sentencing

4  Guidelines level of 25 and allows for all available arguments under 18 U.S.C. § 3553.[11]

5        As part of the plea agreement, Mr. Noh (and Ambiance) stipulated to the

6  government's seizure of the money from ▮▮▮▮▮ and agreed to a payment schedule that

7  includes full restitution of the unpaid duties and unpaid taxes plus all interest and penalties.

8  The total restitution amount, including interest and penalties, is $35,227,855.45, of which

9  about $18 million represents the customs fraud and the remaining about $17 million

10  represents the tax violation.[12]  This amount is already in the Government's possession and

11  will be immediately paid over to the appropriate agencies upon imposition of Mr. Noh's

12  sentence.  Beyond paying full restitution, Mr. Noh (and Ambiance) also agreed to pay an

13  additional forfeiture judgment of about $81 million on a payment schedule requiring a $10

14  million payment within 90 days of sentencing, followed by yearly payments of about $14

15  million thereafter until the total amount is paid.  Mr. Noh has already saved the money

16  required for the first payment and is prepared to make the payment as agreed.  He will also

17  ensure that the other payments are made as he agreed.

18        Ambiance has previously been sentenced by this Court pursuant to a Rule

19  11(c)(1)(c) plea agreement.  Because Ambiance is owned and operated by Mr. Noh, its

20  resolution and conduct is relevant to Mr. Noh as well.  Specifically, Ambiance's plea

21

22  

---

[10]  The objects of the conspiracy are customs fraud (18 U.S.C. §§ 542 & 545); money
laundering in support of the customs fraud (18 U.S.C. 1956(a)(2)(A)); failure to file
currency transaction reports (31 U.S.C. §§ 5331(a) & 5342(d)(2)); and subscribing to a
false tax return (26 U.S.C. § 7206(1).

[11]  The parties have stipulated that no other guidelines offense characteristics, adjustments,
or departures apply.  Dkt. 7 ¶ 29.

[12]  The actual tax loss was about $6.8 million.  Penalties and interest make up the rest of
the $17 million restitution amount to the IRS.

1    obligates the company to the same financial payments as described above for Mr. Noh.

2    But even more importantly, Ambiance agreed to a comprehensive monitorship and it has

3    been operating with this monitorship since January 21, 2021.

4         The monitorship is overseen by Marty Laffer, a CPA who is a former IRS Special

5    Agent.  Mr. Laffer and his team have audited Ambiance's business practices, met with and

6    advised Ambiance's employees, and conducted training for all employees who are exposed

7    to the areas in which the company has had compliance issues in the past.  Significantly,

8    when Mr. Laffer first became involved with Ambiance, he suggested that its affiliated

9    entities, Apparel Line and Blue Dot, should also be subject to monitoring because of the

10   close relationships between those entities and Ambiance.  Even though Ambiance's plea

11   agreement does not require any monitoring of Apparel Line or Blue Dot, Mr. Noh

12   implemented the monitorship over those entities as well.  Mr. Laffer confirms in a letter

13   that Ambiance has been in full compliance with the monitorship.  (Exh. 1.)  Importantly,

14   while the Monitor has suggested additional best-practices, which Ambiance has

15   implemented, the Monitor did not find violations going on when he and his team began

16   working with Ambiance.  As noted earlier, the violations at Ambiance ended in 2012 and

17   2014.

18                              **V.**

19                    **THE APPROPRIATE SENTENCE**

20        Mr. Noh respectfully submits in light his spontaneous cessation of the tax offenses

21   almost a decade ago, his complete cessation of all offenses seven years ago, the good

22   works and support he has given to others throughout his life, the complex background and

23   "unique frailties" that led him here, and his age and significant health risks, a sentence that

24   does not impose incarceration is appropriate under § 3553.  Mr. Noh is prepared to comply

25   with any additional terms the Court deems appropriate and has already committed to the

26   continued operation of Ambiance pursuant to all "best practices" advised by the monitor

27   (including even those outside the scope of the Court's order in the Ambiance sentence).

28   And he will obviously comply with his obligations to pay the additional monetary

1    penalties – beyond restitution – over the next five years.

2    **A.      Impact of the Sentencing Reform Act**

3    In 18 U.S.C. § 3553(a), Congress identified factors which a Court should use in

4 fashioning an appropriate sentence.  In *United States v. Booker*, 543 U.S. 220, 245 (2005),

5 the Supreme Court held that the Sentencing Guidelines calculations are simply an advisory

6 starting point.  *Booker* and its progeny have made clear that district judges must craft an

7 appropriate sentence by taking into full account the factors set forth in 18 U.S.C.

8 § 3553(a), including the history and characteristics of the Defendant. *See United States v.*

9 *Plouffe*, 445 F.3d 1126, 1130 (9th Cir. 2006) ("Booker does not establish that a sentence

10 within the Guidelines range is per se reasonable, and therefore lawful.  Rather, the

11 reasonableness of a sentence is informed by all of the § 3553(a) factors, including the

12 Guidelines range.")  Limitations on the factors the Court may consider in sentencing under

13 the Guidelines – such as previously impermissible grounds for departure – "no longer

14 constrain the court's discretion in fashioning a sentence within the statutory range." *United*

15 *States v. Ameline*, 400 F.3d 646, 656 (9th Cir. 2005).  Instead, district judges should

16 determine sentences befitting a Defendant's individual circumstances and must "consider

17 every convicted person as an individual and every case as a unique study in the human

18 failings that sometimes mitigate, sometimes magnify, the crime and the punishment to

19 ensue." *United States v. Tadio*, 663 F.3d 1042, 1052 (9th Cir. 2011) *cert. denied*, 132 S.

20 Ct. 2703 (2012) (citing *Koon*, 518 U.S. at 98).

21    Moreover, a sentencing court "may not presume that the Guidelines range is

22 reasonable," *Gall*, 552 U.S. at 50, and cannot "require extraordinary circumstances to

23 justify a sentence outside the Guidelines range."  *United States v. Bolds*, 511 F.3d 568,

24 580-81 (6th Cir. 2007) (quotation omitted.)  Rather, a sentencing court "must [instead]

25 make an individualized assessment based on the facts presented …." *Bolds*, 511 F.3d at

26 580 (citing *Gall*.)  Consequently, once the advisory guidelines sentence is determined, the

27 Court must consider other relevant facts and circumstances.  In particular, pursuant to 18

28 U.S.C. § 3553(a), the Court must "impose a sentence sufficient, but not greater than

necessary." After Booker, the factors set forth in Section 3553(a) "have a new vitality in channeling the exercise of sentencing discretion." *United States v. Trujillo-Terrazas*, 405 F.3d 814, 819 (10th Cir. 2005).  Accordingly, district courts now have more discretion to tailor sentences to the individual circumstances of a case.  *Id.*

**B.      The Presentence Report and Recommendation**

The Presentence Report correctly determined a total offense level of 25, resulting in a Guidelines range of 57 to 71 months. (Dkt. 61 ¶ 130.)  But in her Disclosed Recommendation letter (Dkt. 60, at 7,) the Probation Officer concludes that "a sentence within the advisory range would be greater than necessary to comply with the goals of sentencing as set for in 18 U.S.C. § 3553(a)(2)."  The defense agrees.  The Probation recommendation suggests that a downward variance is appropriate based on "the characteristics of the defendant."  (*Id.*)  The defense agrees with this as well.

After finding a variance appropriate under § 3553, the Probation recommendation suggests that the variance should be a six month reduction from the guidelines sentence, resulting in a sentence of 51 months, as "sufficient but not greater than necessary" to achieve the goals of sentencing.  The defense submits that 51 months custody is still much greater than necessary.

The Presentence Reports notes that the case agent has claimed that cash circulating in the apparel district included drug money but also correctly notes that there is no evidence that Mr. Noh knew or suspected that any of the cash he accepted represented illegal proceeds.  (Dkt. 61 ¶ 66.)  Moreover, the government has stipulated that it would not argue for the application of the USSG § 2S1.3(b)(1)(A) enhancement for such knowledge.  (Dkt 7 ¶ 29, line 16.)  In other words, this comment by the case agent should not have bearing on Mr. Noh's sentence.

The PSR notes Mr. Noh's acceptance of responsibility in a letter he provided the Probation Officer:

I accept responsibility for what I have done.  From the day I started my own business in a swap meet, all I could think about was how I needed to make

1   sure it didn't fail.  First, my family depended on me; then my employees

2   depended on me; then customers and even vendors depended on me.  For all

3   of them, I needed to do everything to be successful.  Even once the business

4   was a success, I always worried that some disaster was just around the corner

5   and I needed to protect against it.

6       I broke the law because of the stupid idea that this was the only way

7   to make the business work in this industry.  I thought everyone did it – and it

8   is true that in my business community, most people did.  But that is not an

9   excuse.  Even before the government caught me, I realized how stupid and

10  wrong I was being and voluntarily tried to and did stop a lot of it.  But it was

11  very difficult to fix everything I had done.  In the end, the money was a

12  burden on me and I didn't do anything with it.  It just sat around making me

13  worried.  All the while, I was still trying to run the business for my family,

14  my employees, customers, vendors and all who depended on me.

15      I'll never forget the shame I felt when I informed my family,

16  employees, and close friends, about what I did.  It was a relief to finally tell

17  the truth and I tell as many people that I can that they should learn from my

18  mistakes.  Our company has operated 100% by the book since 2014,

19  something that people in my business and community once thought was

20  impossible.  If people see that this is possible and learn from it, that is some

21  small good that comes from my mistake.  I'm very grateful that the

22  government agreed to allow the business to continue and I am still able to

23  help people who depend on me.  Having the compliance monitor is a relief

24  because now we always know exactly how to do things 100 percent

25  correctly.  That is the way we do things now and will be the way we always

26  do things in the future.  I am terribly sorry for the mistakes I made and the

27  wrong things that I did.

28  (Dkt. 61 ¶ 55.)

**C.     A Non-Custodial Sentence Is Appropriate in Light of the § 3553 Factors**

Section 3553(a) requires the Court to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public from future crimes of the defendant, and provide the defendant with needed medical care; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range recommended by the Guidelines; (5) any pertinent policy statement; (6) the need to avoid unwarranted sentencing disparities among defendants; and (7) the need to provide restitution to any victims.

**1.     The nature and the circumstances of the offense and the history and characteristics of the defendant - § 3553(a)(1)**

The nature of the offense and Mr. Noh's history and characteristics are set out in more detail earlier in this memorandum.  In summary, Mr. Noh's childhood memories of living in extreme poverty and danger in post-war Korea, as well as the trauma caused by the sudden failure of his father's business and resulting hardship has left him with an overwhelming, near-obsessive sense of responsibility for supporting his family and others who rely on him.  As a result, despite his apparent success, Mr. Noh lived with the constant, even irrational, fear that Ambiance may face a sudden reversal of fortunes that would subject his employees and the many business partners who rely on him – as well as their families – to the same trauma that he experienced as a child.

Mr. Noh should have refused to accept cash from those customers who did not fill out Form 8300s – who accounted for a very small part of his successful business anyway.  However, Mr. Noh feared that turning away even those small customers could put Ambiance in danger.  So instead, he accepted the cash ███████████████████ ██████ taking solace in the irrational belief that even if what happened to his father happened to him, he could use the cash to continue supporting his those who relied on him.  Similarly, when the business faced a sudden existential threat due to the cotton price shock

1  of 2010 and 2011, Mr. Noh's anxiety drove him to begin undervaluing invoices to

2  customs.  It is also worth noting that Mr. Noh ceased the tax offenses of his own volition

3  almost a decade ago, long before he was investigated.  And he has operated Ambiance in

4  full compliance with the law for the past seven years.

5       While Mr. Noh's actions were undeniably of his own volition, they were

6  nevertheless influenced by his unique upbringing and resulting fears and anxieties, rather

7  than pure desire for personal gain.  This conclusion is bolstered by Mr. Noh's many good

8  works and his unusual commitment and generosity to those who depend on him, whether it

9  be his own employees, students at his alma mater, or even children at the orphanages he

10  supports.

11       In short, § 3553(a)(1) requires the Court to consider the manner in which the

12  offense occurred, including the large dollar amounts involved, and also requires the Court

13  to consider the rest of Mr. Noh's life, including its challenges and his resulting unique

14  frailties, as well as his history of lawful conduct since 2012 and 2014.  The defense

15  submits that the unique circumstances of Mr. Noh's offense as well as Mr. Noh's unique

16  history and characteristics, on balance, support a non-custodial sentence.

17       **2.     The need for the sentence to reflect the seriousness of the offense, to**

18       **afford adequate deterrence, to protect the public from further crimes**

19       **from the defendant, and to provide the defendant with needed medical**

20       **care - § 3553(a)(2)**

21       Mr. Noh does not seek to understate the gravity of his crimes.  These are serious

22  offenses.  But the unique circumstances of this case support the conclusion that a custodial

23  sentence is greater than necessary to satisfy the § 3553(a)(2) factors.

24       With respect to the inherent seriousness of the offense, while Mr. Noh does not

25  dispute the serious nature of his crimes or the significant dollar amounts involved.  But it is

26  also true that the case against Ambiance was just one search warrant among dozens in the

27  Fashion District, meaning that these issues were endemic to the industry.  This does not

28  mean that they are inherently less "serious," perhaps even the contrary, but it does mean

1  that the "clean up" of that industry should not require that everyone – or Mr. Noh – must

2  serve a lengthy prison sentence merely to establish that these offenses are serious.  On the

3  contrary, Ambiance has been complying with the law since 2012 and 2014.  And the

4  industry in general has made tremendous progress, even without lengthy sentences having

5  been imposed on anyone.  This is also relevant to the deterrence factor of § 3553(a)(2):

6  both with respect to specific deterrence and general deterrence, the felony guilty pleas,

7  monitorship, significant financial penalties, and all remaining penalties from a criminal

8  prosecution and sentence establish significant deterrence.  Indeed, the past seven years of

9  compliance have proved that a custodial sentence is unnecessary.

10      Section 3553(a)(2)(D) requires the Court "to consider . . the need for the sentence

11  imposed . . . to provide the defendant with needed . . . medical care . . . in the most

12  effective manner."  This includes consideration of the specific medical risks posed by the

13  COVID-19 pandemic.  *See*, *e.g.*, *United States v. Robinson*, -- F. Supp. 3d --, 2020 WL

14  19822872, N.D. Cal., April 27, 2020 (section 3553(a)(2)(D) requires court to take into

15  account the COVID-19 risk posed by incarcerating a high-risk defendant.)  Mr. Noh is at

16  high-risk from COVID-19 for at least four separate reasons, including his age, his history

17  of tuberculosis and resulting scarring of his lungs, his cardiac condition, and his history of

18  high blood pressure and stroke.[13]  Mr. Noh has submitted documentation from his doctors

19  about his medical risks and need for continued medical monitoring and treatment.

20      Especially given the well-documented threat of COVID-19 in incarcerated settings,

21  the defense submits that § 3553(a)(2)(D)'s requirement that the Court consider available

22  medical care supports a non-custodial sentence whereby Mr. Noh could avoid the serious

23  risk of severe disease from COVID and obtain effective medical care for all of his medical

24

---

25  [13]  As to the health risks of advanced age and COVID in custody, in the Central District of
   California, the district court set 50 as the age at which inmates must be evaluated for
26  release due to COVID dangers, even without any additional medical conditions.  *See*
   *Torres v. Milusnic*, 472 F.Supp.3d 713, 728 (C.D. Cal. 2020).  Mr. Noh is 67 with multiple
27  serious underlying medical conditions, each of which alone would fall within the risk
   categories recognized in *Torres*.
28

1  conditions.

2  **3.    The kinds of sentences available, the guidelines range, any pertinent**

3  **policy statements. unwarranted sentencing disparities, and the need to**

4  **provide restitution - § 3553(a)(3)-(7)**

5  The Court has the authority to impose a non-custodial sentence here: "Probation

6  may be used as an alternative to incarceration, provided that the terms and conditions of

7  probation can be fashioned so as to meet fully the statutory purposes of sentencing,

8  including promoting respect for law, providing just punishment of the offense, achieving

9  general deterrence, and protecting the public from further crimes by the defendant."

10  U.S.S.G. §5B intro. comment.

11  The guidelines range is discussed above and the Court must of course consider it.

12  But as also noted above, a Court "may not presume that the Guidelines range is

13  reasonable," *Gall*, 552 U.S. at 50, and cannot "require extraordinary circumstances to

14  justify a sentence outside the Guidelines range." *United States v. Bolds*, 511 F.3d 568,

15  580-81 (6th Cir. 2007) (quotation omitted.)

16  There are no other defendants in this case that would raise an issue of sentence

17  disparities.  Moreover, sentencing Mr. Noh on the facts of his own crime and the

18  circumstances of his own life means that any disparities between him and others with

19  different circumstances would not be "unwarranted."

20  As to restitution, as noted earlier, the full amount of restitution, including interest

21  and penalties, is already in the government's possession.  As to the remaining financial

22  obligation to pay the agreed-upon forfeiture obligations, the Court has the discretion to

23  impose special conditions to ensure that Mr. Noh complies with those obligations as well.

24  U.S.S.G. § 5B1.3(d)(2).  The Court may also order Mr. Noh to perform community service

25  as a condition of probation.  U.S.S.G. §5B1.3(e)(3).

26  **VI.**

27  **CONCLUSION**

28  Mr. Noh and his business underpaid millions of dollars in taxes and duties owed to

the Government.  Mr. Noh acknowledges that this is a serious offense and he does not seek to minimize the harm caused by his conduct.  He does not believe he is entitled to leniency because he is a successful businessman, or even because he takes care of his employees or contributes to charity, or because he has agreed to pay a very substantial financial penalty in addition to restitution.  Rather, Mr. Noh asks that in determining the appropriate sentence, the Court understand the unique anxieties and failings that contributed to his offense, despite the fact that he is a generous, supportive member of society, who has for decades supported those around him in ways far above and beyond his obligations. Sentencing requires individualized consideration and the defense submits that in light of Mr. Noh's history and character, in light of his voluntary cessation of the tax offense, in light of his past seven years of full legal compliance, in light of his wife's fragility, and in light of Mr. Noh's age and medical condition, a sentence other than incarceration serves the purposes of sentencing and accomplishes justice here.

Whatever sentence the Court chooses to impose, Mr. Noh is committed to atoning for his crimes, and upon conclusion of his sentence, continuing to do what he cherishes the most: being reliable and honest to his business partners, treating his employees with generosity and dignity, supporting all of those who depend on him, and above all, always being present for his family as a loving husband, father, and grandfather.

The defense submits that a non-custodial sentence is "sufficient, but not greater than necessary" to satisfy the goals of sentencing under § 3553(a) and respectfully asks the Court to sentence Mr. Noh accordingly.

DATED:  November 22, 2021   Benjamin N. Gluck
             Christopher J. Lee
             Bird, Marella, Boxer, Wolpert, Nessim,
             Drooks, Lincenberg & Rhow, P.C.

By: _____
    Benjamin N. Gluck
  Attorneys for Sang Bum Noh, aka "Ed Noh"